Russell A. WEAVER *v.*
NABORS DRILLING USA and
F.A. Richards & Associates, Inc.

CA 06-543                                              253 S.W.3d 30

Court of Appeals of Arkansas
Opinion delivered March 14, 2007

*Walker, Shock, Cox & Harp, PLLC,* by: *J. Randolph Shock,* for appellant.

*Huckabay, Munson, Rowlett & Moore, P.A.,* by: *Carol Lockard Worley* and *Jarrod S. Parrish,* for appellees.

LARRY D. VAUGHT, Judge. This workers' compensation case, where the Commission held that Russell Weaver had failed to prove his injury was compensable, presents the issue of the meaning of the term "specific incident" as found in Ark. Code Ann. § 11-9-102(4). We affirm the decision of the Commission.

Weaver began working for appellee, Nabors Drilling, in December 2004. On either March 3 or 4, 2005, he complained that his hands were "tingling" and "burning" while he was "mixing mud" for his job. At the hearing, he stated that he was "picking up a sack of mud and carrying it a few feet" when he first noticed the sensation in his hands; however, he was unable to define a specific incident that caused his condition. He left work, went home, took a shower, and when he woke up the next morning, his hands were seriously swollen. He believed that he was having a chemical reaction to the mud.

On March 6, 2005, Weaver went to the emergency room for treatment. He complained of "swelling to both hands & feet, rt shoulder/arm pain radiating into neck began 2-4 days ago." There was no mention of a specific workplace accident, but there was a notation that Weaver's symptoms had started at work on March 5, 2005. A cervical-spine series was taken on April 15, 2005, and an MRI on April 26, 2005. The MRI showed mild disc herniation at C5-6 interspace and C6-7 interspace.

Weaver signed a Form AR-C on May 17, 2005, and stated that he had injured his cervical spine while "slipping pipe" and "mixing mud."Appellee had terminated Weaver on March 7, 2005, because he had not shown up at work.

When reviewing a decision of the Workers' Compensation Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission, and we affirm that decision if it is supported by substantial evidence. *Searcy Indus. Laundry Inc. v. Ferren*, 82 Ark. App. 69, 110 S.W.3d 306 (2003). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* at 72, 110 S.W.3d at 307. We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Id.* In making our review, we recognize that it is the function of the Commission to determine the credibility of witnesses and the weight to be given their testimony. *Id.* Furthermore, the Commission has the duty of weighing medical evidence and, if the evidence is conflicting, its resolution is a question of fact for the Commission. *Id.* We review the opinion of the Commission, not of the Administrative Law Judge. *Daniels v. Affiliated Foods Sw.*, 70 Ark. App. 319, 17 S.W.3d 817 (2000).

A compensable injury is defined in Ark. Code Ann. § 11-9-102(4) as an "accidental injury . . . arising out of and in the course of employment. An injury is 'accidental' only if it is caused by a specific incident and is identifiable by time and place of occurrence." A compensable injury must be supported by objective medical findings not under the voluntary control of the claimant. Ark. Code Ann. § 11-9-102(4), (16). The claimant has the burden of proving by a preponderance of the evidence that his injury is compensable. *Id.* § 11-9-102(4). Thus, the statute sets up the what, where, and when test of compensability.

In *Edens v. Superior Marble & Glass*, 346 Ark. 487, 58 S.W.3d 369 (2001), the supreme court discussed the when and where elements of the compensability test. The court held that "identifiable by time and place" meant subject to identification and did not require the claimant to specify the exact time of the occurrence. However, that is not the issue in this case. No one denies that Weaver identified the approximate time and date when he first noticed the symptoms, and no one denies that this notice occurred while he was at work. What the Commission held was missing in Weaver's proof was the specific incident itself. Weaver's testimony varied on this issue. He stated that he first noticed the tingling in his hands when mixing mud; he also stated that his head felt heavy and he just thought he was tired; and he testified that he thought that the symptoms came on gradually over a period of time (although he did not allege gradual onset in his claim). The Commission noted:

> The Form AR–C signed by the claimant did not detail a specific incident. We also note the claimant's recorded telephone interview, in which he attributed his symptoms to "repetitious" movements at work. The claimant also told the telephone interviewer that he could not recall "one specific incident" which the claimant thought caused the tingling and burning in his hands.

Weaver's argument is that his job must have caused his cervical injury because there is no other explanation. However, the record indicates that he sustained neck and back injuries after a fall in July 1995. Although his CT scan at the time was normal, this is of interest because it indicates a prior neck injury. Furthermore, the Commission concluded that there is absolutely no indication that a workplace accident caused Weaver's condition. The only notation that even refers to his work is in the medical record, noting that he first started feeling symptoms in his hands while at work. He could have easily injured himself the day before, weeks before, or during his 1995 fall. Finally, the Commission is free to make determinations of credibility. Weaver admitted the 1995 fall, but stated that he did not remember having back and neck pain afterward.

While we may have reached a different conclusion if we tried the facts, we must affirm the Commission's decision if substantial evidence supports it, and in this case it does. Weaver failed to prove his case. He only proved that he had an injury and that he felt pain while at work — he failed to show that a specific

incident occurred at work. He asks this court to infer that his injury was caused by his employment — something we are not permitted to do.

Affirmed.

PITTMAN, C.J., and GLADWIN, MARSHALL, and MILLER, JJ., agree.

HART, ROBBINS, GLOVER, and BAKER, JJ., dissent.

DAVID M. GLOVER, Judge, dissenting. The majority affirms the Commission's denial of benefits to Russell Weaver. I cannot agree because, in my opinion, Weaver proved that he sustained a compensable injury.

A more expansive summary of the facts than the majority offered is necessary. Weaver was the only witness to testify before the ALJ. He said that he worked for appellee as a floor hand. He denied having problems with his hands or neck prior to working for appellee, although he said that he had prior back problems that he disclosed before going to work for appellee. He explained that as a floor hand, he worked twelve hours on, twelve hours off, for eight straight days, and then he was off for four days. He testified that if he was not drilling or making routine connections, he was cleaning, mixing mud, or digging ditches. He explained that on the night of March 3-4, the crew was running short-handed, with only a four-man crew when there was normally a five-man crew. He explained that when the drilling pipe was disconnected, he had to throw slips in, and if the slips got stuck, he had to yank on them. He also explained that he had to look straight up sixty-five feet or so while he was making that connection. Weaver said that his crew had disconnected sixty-three pieces of pipe that day and they were double strands. He also said that "mud" came in 100-pound sacks and had different chemicals mixed in it.

Weaver testified that something unusual happened to him on March 3-4, the seventh day of his eight-day rotation — first, while he was tripping pipe, his head began to feel "real heavy" and he took his hard hat off during a break. He said that he thought the heaviness was just from tripping the pipe and from being tired. Weaver resumed work after his break, by helping a co-worker mix mud. He testified that while he was mixing mud, his hands started tingling and felt like they were going to sleep. Weaver indicated that he did not fill out any paperwork after his shift — he explained

that when you sign out, there is a box to check if you were injured, but he did not know if he had been injured, so he just left the box blank.

Weaver said that he was "wore out," so he drove home, took a bath, and went to bed. He said that when he woke up, his fingers were swollen, so he called a co-worker and told him that his hands were swollen. According to Weaver, the co-worker asked what the swelling was from, and he said that he thought it was from the chemicals in the mud he mixed. Weaver told his co-worker that he could not come in that day.

Weaver went to the emergency room twice, where the doctor took him off work and gave him medication. Weaver also went to a safety meeting at work on Monday morning during his four days off work and gave the human-resources person the note from the emergency room stating that he had been taken off work. Weaver testified that he was then told that he could not be at work under a doctor's care and that he needed to go home. He said that appellee did not let him fill out any forms and did not tell him what doctor to see. Weaver testified that the ER doctor told him to find out who appellee's primary care physician was; he checked, but after being given the "runaround," he was told that he would have to take care of it himself. Weaver said that when he asked if he could return to work if the doctor would allow him to do so, he was told that he had been replaced.

Meanwhile, the ER referred Weaver to a neurosurgeon, who would not see him because he did not have any insurance. However, an MRI did indicate that his vertebra were pinching a nerve. Weaver testified that he still had no feeling in his fingers.

On cross-examination, Weaver agreed that he initially thought his symptoms were caused by the chemicals in the mud he mixed. He explained that the problem had to be work related because all he did was drive home, take a shower, and go to bed. He admitted that he did not know for sure if he told his co-worker if his problem was work related. Weaver candidly stated that he did not really know how he hurt himself.

On these facts, the Commission reversed the ALJ's grant of benefits, finding that Weaver did not prove that he sustained a compensable injury because he was unable to demonstrate an injury that was capable of being identified. In support of its decision, the Commission cited *Edens v. Superior Marble & Glass*, 346 Ark. 487, 58 S.W.3d 369 (2001). However, in that case, the

employee was unable to pinpoint the specific date of his injury, but said he injured his back while slinging marble. Our supreme court awarded benefits, reversing the Commission. Here, Weaver is unable to pinpoint the specific time of his injury; however, it is apparent that it was work related — on the seventh day of an eight-day shift, he began having problems at work; all he did after work was drive home, take a shower, and go to bed; and when he awoke, his hands were swollen. I find that this evidence shows the occurrence of an injury that is sufficiently identified by the employee to comport to the definition within Arkansas Code Annotated section 11-9-102(4).

The majority attempts to distinguish this case, saying that while no one denies that Weaver identified the approximate time and date when he noticed the symptoms, which was during the time he was at work, he did not prove the specific incident itself. However, neither did the appellant in *Edens*. In this case Weaver's cervical injury did not manifest itself like breaking a bone or accidentally amputating a body part — it was apparent that Weaver was unsure of what, though something, was happening in his body that made his head heavy and his hands and arms tingle. In any event, Weaver was not the only person who could not categorize his symptoms from the onset as a cervical injury — it took multiple trips to the emergency room for even the medical professionals to determine what was wrong with him. In support of Weaver's claim, the very first emergency-room visit mentioned that the onset of symptoms occurred at work. This complaint is documented in his first ER visit on March 6, wherein he reported pain radiating into his neck. Under the majority's analysis, it is simply appellant's bad luck that he experienced an injury that he could not pinpoint with more certainty instead of breaking a leg or poking out his eye on the job.

Furthermore, the Commission stated that it could not causally connect the degenerative changes seen on the April 2005 MRI to an accidental injury. Since the MRI report did not mention any degenerative changes, the Commission factually erred when it attributed the problems seen on the MRI to degenerative changes.

The majority mentions that the record indicates that appellant had sustained neck and back injuries in a fall in July 1995, but then admits that the CT scan at that time was normal. Nevertheless, the majority recites that this ten-year-old injury is "of interest," stating that appellant "could have easily injured himself the day before, weeks before, or during his 1995 fall." There is no

evidence to support this assertion. The majority is simply specu-lating and grasping at straws to affirm an incorrect denial of benefits by the Commission. In the process, the majority ignores (1) the fact that appellant had worked for seven days straight, twelve hours per day, in a labor-intensive job; (2) the first ER report in which appellant reported neck pain; and (3) the MRI, which establishes his injury.

I fail to see how reasonable persons could arrive at this conclusion, especially given the factual errors in the Commission's reasoning, and I would reverse for an award of benefits. I am authorized to state that Judges Hart, Robbins, and Baker join this dissent.