Cite as 2025 Ark. App. 48

# ARKANSAS COURT OF APPEALS
## DIVISION IV
No. CV-24-140

| | |
|---|---|
| MINERAL SPRINGS SCHOOL DISTRICT AND ARKANSAS SCHOOL BOARDS ASSOCIATION<br><br>APPELLANTS<br><br>V.<br><br>MARGARET MACON<br>APPELLEE | Opinion Delivered January 29, 2025<br><br>APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION<br><br>[NO. H107091]<br><br><br>AFFIRMED |

**WENDY SCHOLTENS WOOD, Judge**

Mineral Springs School District and the Arkansas School Boards Association (collectively, "appellants") appeal a decision of the Arkansas Workers' Compensation Commission ("Commission") finding that Margaret Macon sustained compensable injuries to her neck and back and finding that all medical treatment provided and additional treatment proposed was reasonably necessary treatment for those injuries. On appeal, appellants argue that substantial evidence does not support the Commission's finding that Macon's injuries are compensable. Specifically, they contend that Macon's injuries are preexisting and that there are no "acute objective findings" of an injury to either her neck or her back. We affirm.

On October 6, 2020, Macon was sixty-eight years old and working for the Mineral Springs School District as a seventh- and eighth-grade math teacher when a desk she was leaning against collapsed, causing her to fall to the floor on her "bottom." Macon was unaware that a screw had come loose from the table leg. Coworker Cara Lamb was in Macon's classroom at the time and witnessed the fall. Macon testified that the classroom was full of students, some of whom "screamed" and attempted to help her, so she tried to get up quickly. She said that she "felt a little something" in her lower back but "brushed it off to the fact" that she had just fallen pretty abruptly. Lamb confirmed that when Macon got up from the floor, she said that she felt a "twinge" in her lower back. Macon did not seek medical attention that day. However, the pain got progressively worse over the next two days such that she could not lie flat or turn over in bed and had to sleep in a recliner. Three days after the incident, she told the school secretary that she needed to leave school to go see her doctor. The secretary told Macon to report the incident to Marla Williams, who handles insurance and workers' compensation claims for the school district, which Macon did on October 9.

Macon then went to HealthCare Express because it was after 5:00 p.m. and her family doctor's clinic was closed. She testified that she complained about pain in her back and her hip and that they took an x-ray of her hip and prescribed pain medication. Still in pain five days later, Macon went to her family doctor, Dr. Dean Bowman, and was examined by the nurse practitioner, Ellen Jones. Macon testified that her back and hip were still bothering her and that she had begun to "feel a little something in [her] neck." She was given

2

medication for lumbar muscle spasms. She said that she was still sleeping in the recliner because she could not lie flat and was propping her neck on a neck pillow.

Macon said that several weeks later she began experiencing "real sharp pain" in her right arm and that her shoulder and neck began hurting so badly that she went to the Christus St. Michael emergency room on October 28. She testified that while she had been experiencing pain in her right arm, it was pain in her left arm that sent her to the emergency room. The doctors at Christus St. Michael referred her for a cervical CT scan and an MRI of her thoracic spine, which were performed the next day. The thoracic MRI indicated a small "lesion near the superior endplate of the T10 and inferior endplate of T6 [that] most likely represent mild atypical benign hemangiomas." Impressions included mild multilevel degenerative changes without canal stenosis as well as a "[m]ild right and moderate left foraminal compromise at T10-T11." The cervical CT scan indicated multilevel cervical spondylosis with a "right paracentral focal disc protrusion resulting in compressing mass effect" at C4-5 and multilevel moderate stenoses at C5-6 and C6-7. The scan also noted "[s]evere right foraminal stenosis at C4-5." Macon said that after Dr. Bowman had reviewed the results of the CT scan and MRI, he recommended she see Dr. Rajesh Arakal, a surgeon at the Texas Back Institute in Plano, Texas.

Macon's first of three appointments with Dr. Arakal was on December 4. Dr. Arakal reported in his notes that day that Macon was having significant radiating pain from her neck down to her arm with "acute loss of function" in her right arm and difficulty with mobilization. Dr. Arakal reported that the imaging studies revealed spinal cord compression

3

at C4-5, C5-6, and C6-7. Due to continuing left arm pain and difficulty with driving, he also diagnosed her with "cervical myelopathy positive Hoffman's." Dr. Arakal eventually recommended surgery, which Macon chose not to pursue at the time due to potential complications with her diabetes.

Macon continued to experience pain in her lower back and neck, which radiated to her left arm, so Dr. Bowman referred her to Precision Spine Care. After an assessment of Macon in August 2022, Dr. Harold Fite at Precision reported that the CT scan showed degenerative disc disease and facet arthropathy with lateral recess and foraminal stenosis at C4-5 and C5-6 as well as severe stenosis at C4-5 and moderate stenosis at C5-6 and C6-7. She visited Precision again on January 11, 2023, with complaints of neck pain that radiated to her left hand and arm and pain in her left shoulder and hip. On February 6, Dr. Fite treated Macon with a cervical interlaminar epidural steroid injection at C6-7. At the March 14 hearing, Macon said this treatment was helpful but was "wearing off." Still, she said that she wanted to put off the surgery recommended by Dr. Arakal for as long as possible due to her diabetes, and she planned to address the pain with medication and further treatments at Precision.

Macon admitted at the hearing that after a car accident in October 2016, she had been evaluated due to neck pain that radiated to her right shoulder and right arm. A CT scan of her cervical spine in 2016 revealed a significant disc bulge or herniation on the right at the C4-5 interspace and a mild posterior disc bulge at C6-7. An MRI in 2016 revealed disc herniation at C4-5 and C5-6 with moderate foraminal stenosis. She was treated with physical

4

therapy and pain medication, but she never saw a surgeon or specialist for the discomfort. Macon said that she had never experienced the radiating pain in her arm that she experienced after the 2020 work incident.

In June 2017, Macon went to HealthCare Express to treat neck pain from another car accident and was diagnosed with sprain of ligaments of the cervical spine and muscle spasms. She was prescribed pain medication and muscle relaxers. According to Macon, the issues resolved, and she experienced no problems with her neck or back for over two years until the 2020 work incident.

On June 12, 2023, the administrative law judge ("ALJ") issued an opinion determining that Macon had proved by a preponderance of the evidence that she sustained compensable injuries to her back and neck while at work on October 6, 2020. The ALJ also found that Macon had proved that all the medical treatment of record was reasonably necessary treatment for those injuries. Finally, the ALJ found that Macon had proved her entitlement to additional treatment, including the surgery recommended by Dr. Arakal and any other pain management as recommended by her treating physicians. Appellants appealed to the Commission, which affirmed and adopted the ALJ's opinion.

When the Commission affirms and adopts the ALJ's opinion, thereby making the findings and conclusions of the ALJ the Commission's findings and conclusions, we consider both the ALJ's opinion and the Commission's opinion in our review. *Watson v. Highland Pellets, LLC*, 2022 Ark. App. 132, at 5, 643 S.W.3d 267, 270. When reviewing a decision of the Commission, we view the evidence and all reasonable inferences deducible therefrom in

the light most favorable to the findings of the Commission, and we affirm that decision if it is supported by substantial evidence. *Weaver v. Nabors Drilling USA*, 98 Ark. App. 161, 162, 253 S.W.3d 30, 31 (2007). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*, 253 S.W.3d at 31. We will not reverse the Commission's decision unless we are convinced that fair-minded persons with the same facts before them could not have reached the conclusions arrived at by the Commission. *Id.*, 253 S.W.3d at 31–32. Questions concerning the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Patterson v. Ark. Dep't of Health*, 343 Ark. 255, 265, 33 S.W.3d 151, 157 (2000). When there are contradictions in the evidence, it is within the Commission's province to reconcile conflicting evidence and to determine the true facts. *Marshall v. Ark. Dep't of Corr.*, 2020 Ark. App. 112, at 5-6, 594 S.W.3d 160, 163. The Commission is not required to believe the testimony of the claimant or any other witness but may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.* at 6, 594 S.W.3d at 163. The Commission has the authority to accept or reject medical opinions, and its resolution of the medical evidence has the force and effect of a jury verdict. *Poulan Weed Eater v. Marshall*, 79 Ark. App. 129, 134, 84 S.W.3d 878, 881 (2002). Thus, we are foreclosed from determining the credibility and weight to be accorded to each witness's testimony. *Arbaugh v. AG Processing, Inc.*, 360 Ark. 491, 494, 202 S.W.3d 519, 521 (2005).

In addition, an employer takes the employee as the employer finds him, and employment circumstances that aggravate preexisting conditions are compensable. *Vaughn v.*

*Midland Sch. Dist.*, 2012 Ark. App. 344, at 2. A preexisting disease or infirmity does not disqualify a claim if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the disability for which workers' compensation benefits are sought. *Id.* An aggravation of a preexisting noncompensable condition by a compensable injury itself is compensable. *Webb v. Wal-Mart Assocs., Inc.*, 2018 Ark. App. 627, at 5, 567 S.W.3d 86, 90. An aggravation is a new injury resulting from an independent incident, so it must meet the definition of a compensable injury to establish compensability for the aggravation. *Liaromatis v. Baxter Cnty. Reg'l Hosp.*, 95 Ark. App. 296, 299, 236 S.W.3d 524, 527 (2006). A compensable injury must be established by medical evidence supported by objective findings, which are findings that cannot come under the control of the patient, such as complaints of pain or tenderness. *Carter v. GEA N. Am., Inc.*, 2023 Ark. App. 134, at 6–7, 662 S.W.3d 685, 690. But while objective medical findings are required to establish the existence and extent of an injury, they are not required to establish causation. *Vaughn*, 2012 Ark. App. 344, at 3. Causation often comes down to a decision on the credibility of the claimant; medical evidence on causation is not required in every case. *Id.*

We turn first to Macon's back injury. Appellants claim that Macon felt only a "twinge" in her back when she fell, that there were no acute objective findings of a back injury, and that x-rays performed three days after the fall reveal a normal lumbar spine, no fracture, and no scoliosis or spondylolisthesis with normal alignment. The Commission examined the evidence and found that Macon was initially treated for lumbar muscle spasms by Dr.

7

Bowman, which it determined were objective medical findings of an injury to Macon's back.[1] The Commission also specifically found Macon to be an "extremely credible witness[]," and it believed her testimony that her failure to seek immediate treatment was due to her hope that her condition would improve. Instead, her condition worsened, causing her to seek treatment three days later. The Commission also noted that while Macon had been involved in two previous car accidents, she had been asymptomatic for almost three years. Thus, having considered Macon's testimony, Lamb's testimony, the circumstances of Macon's fall, and the lack of any medically documented complaints of recent back problems, the Commission found that Macon had proved a causal connection between her back condition and the October 2020 fall. Substantial evidence supports these findings.

Regarding Macon's neck injury, appellants argue that, after the fall, Macon felt a twinge in her lower back only and not in her neck. Appellants also argue that there were no acute objective findings of a neck injury. Further, they contend that Macon's 2016 and 2017 car accidents that resulted in neck and shoulder injuries—not the 2020 work incident—were the cause of her current neck injuries. They point to the 2016 CT scan providing that Macon had herniations in her neck at the C4-5 and C5-6 levels.

---

[1]We note also that a 2020 MRI of Macon's thoracic spine reported mild multilevel degenerative changes without canal stenosis as well as a "[m]ild right and moderate left foraminal compromise at T10-T11." There is no 2016 scan revealing anything regarding Macon's thoracic spine.

The Commission specifically stated that an aggravation of a preexisting condition is compensable and found that the 2020 CT scan of Macon's cervical spine demonstrated that she had sustained a "new trauma injury" to her neck involving C6-7 that was not present in the 2016 CT images. The Commission further noted that the degree of stenosis is much more significant in severity in the 2020 images versus the 2016 images.[2] The Commission also found that Dr. Arakal characterized the neck injury as cord compression at all three levels—C4-5, C5-6, and C6-7—a new injury. The Commission found these to be objective medical findings of an accidental injury to Macon's cervical spine on October 6. Finally, the Commission found credible Macon's testimony that she had performed her job duties without incident before the October 6 incident, that she had not complained to a medical professional about her neck since 2017, and that the neck and arm symptoms had arisen after the October 2020 fall. Substantial evidence supports these findings.

Appellants essentially ask us to reweigh the evidence and credibility findings made by the Commission, which we simply cannot do. Moreover, we are not convinced that fair-minded persons could not have reached the conclusions arrived at by the Commission. Accordingly, we affirm the Commission's decision.

Affirmed.

---

[2]A CT scan of her cervical spine in 2016 revealed significant disc bulge or herniation on the right at the C4-5 interspace and a mild posterior disc bulge at C6-7. An MRI in 2016 revealed disc herniation at C4-5 and C5-6 with moderate foraminal stenosis. The 2020 CT scan indicated multilevel cervical spondylosis at C4-5 and multilevel moderate stenoses at C5-6 and C6-7. The scan also noted "[s]evere right foraminal stenosis at C4-5."

9

TUCKER and BROWN, JJ., agree.

*Worley, Wood & Parrish, P.A.*, by: *Melissa Wood*, for appellants.

*Moore, Giles & Matteson, LLP*, by: *Gregory Ross Giles*, for appellee.